# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL INDICTMENT |
| v. | NO. 1:09-CR-0522-1-TCB-GGB |
| THOMAS JUSTIN HENRY, | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION AND ORDER

Defendant Thomas Justin Henry ("Defendant") is charged with two counts each of possession with intent to distribute methamphetamine, possession of a firearm during the furtherance of a drug-trafficking crime, and being a felon in possession of a firearm, all in violation of 21 U.S.C. §§ 841(a), (b), and 18 U.S.C. §§ 924(c) and 922(g).

Pending before this Court are Defendant's various motions to suppress [Docs. 30-34 as amended at Docs. 55-57]; Motion to Adopt Co-Defendant Allen's Motion for Bill of Particulars [Doc. 57], Motion to Open Record and Stay Briefing Schedule [Doc. 66], and Motion for Leave to File Excess Pages [Doc. 68]. An evidentiary hearing on the suppression motions was held before me on March 24, 2010. All transcript references are to the transcript of that hearing.

## I.    DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

**A.**    Defendant moves to suppress evidence seized after a car in which he was a passenger was stopped by the police on May 7, 2009.  Defendant argues that the stop of the car was unconstitutional.  Defendant also argues that even if the vehicle stop was not unconstitutional, his consent to the search of his person after the car was stopped was not voluntary, but rather the product of his acquiescence to a show of official authority.

**B.**    Defendant moves to suppress evidence seized from 168 Rocky Ford Road pursuant to a search warrant on the grounds that (1) the application for the warrant was prompted by unlawfully seized evidence from the May 7, 2009 car stop; (2) even if the vehicle stop was lawful, the search warrant application for 168 Rocky Ford Road was stale and otherwise unsupported by probable cause; (3) the affidavit for the search warrant for 168 Rocky Ford Road contains false information that voids the warrant; (4) the officers exceeded the scope of the warrant by seizing a cell phone and a laptop computer that were not listed in the warrant; and (5) the later-obtained search warrants for the cell phone and the laptop computer were obtained by unlawfully seized evidence and were not supported by probable cause.

AO 72A
(Rev.8/8
2)

The government argues that Defendant does not have standing to challenge the search of 168 Rocky Ford Road.

**C.**     Defendant moves to suppress statements that he made on December 29, 2009, on the ground that his statements were not voluntarily made.

## II.   <u>FACTS</u>

**A.**     <u>**The May 7, 2009 traffic stop**</u>.

In the period shortly before May 7, 2009, the Atlanta Police Department ("APD") had been getting complaints of drug activity and commotion at 168 Rocky Ford Road. Neighbors complained that vehicles and people were entering and leaving that property at all hours of the day and night.  Tr. 48.

Patrick Apoian ("Inv. Apoian") worked as an officer for the APD for approximately seven and one-half years, and on May 7, 2009, he was an investigator for APD.  He knew about the complaints regarding 168 Rocky Ford Road.  At an unspecified time shortly before May 7, 2009, Inv. Apoian spoke with individuals leaving the residence at 168 Rocky Ford Road who told him that people were "doing crystal meth in the house."  Tr. 46-7, 57.

Inv. Apoian also knew from other investigators that a fugitive named Stephanie Huesca sometimes went to 168 Rocky Ford Road.  He knew that there was an

3

outstanding arrest warrant for Ms. Huesca. Ms. Huesca's mother told the police that her daughter frequented 168 Rocky Ford Road and associated with people there who were involved in narcotics. Ms. Huesca's mother asked for assistance from the police. Tr. 56, 77-8.

On May 7, 2009, Inv. Apoian was watching 168 Rocky Ford Road in an attempt to locate Ms. Huesca. Inv. Apoian observed a man and a woman come out of 168 Rocky Ford Road together and get into a white Nissan, and he thought that the woman might be Stephanie Huesca. He had once seen a photograph of Ms. Huesca, although he did not have one with him that day and did not recall what she looked like. He did not know any details about the warrant for her arrest other than the fact that it existed. Tr. 50-53.

Inv. Apoian observed the two get into a car, and the man drove them to the Candler Park area. The two picked up another individual (later identified as Defendant Henry) in the Candler Park area, and then the three of them returned in the vehicle to Rocky Ford Road. Tr. 54.

Inv. Apoian wanted the vehicle stopped. He was not in a marked police vehicle, so he alerted marked units of the situation on his police radio and requested that they pull over the white Nissan. Tr. 52, 109-110.

4

APD Officer Lyle Moore ("Officer Moore"), accompanied by Officer Daniel Elie ("Officer Elie") in the passenger seat, heard Inv. Apoian's request for a marked unit and responded to the area in a marked unit. Officer Moore eventually observed the vehicle described by Inv. Apoian driving towards him. Tr. 80-82.

The driver of the white Nissan, Ryan Laskowitz ("Laskowitz"), made eye contact with Officer Moore, and then reached down toward the floorboard and underneath the driver's seat. Based upon Officer Moore's training and experience, Officer Moore suspected that Laskowitz was hiding something or reaching for something that could hurt or harm the officers. Officer Moore made a u-turn and ran the tag of the vehicle before he initiated a traffic stop of the car. Officer Moore learned that the tag for the vehicle had expired. Tr. 80-82.

After the stop, Officer Moore ran the driver's license information and learned that Laskowitz's drivers license had been suspended. Officer Moore asked Laskowitz to step out of the car while he investigated the suspended license. Tr. 112.

In the meantime, Officer Elie approached the passenger side of the vehicle. Officer Elie observed Defendant Henry sitting in the front passenger seat. Defendant appeared nervous in that his hands and body were shaking and he was sweating. Officer Elie ordered Defendant out of the car. Tr. 112-13, 126.

5

As Defendant stepped out of the vehicle, Officer Elie asked Defendant if he had anything illegal on him.  Defendant responded, "Yes," and he began to reach for something in his rear pocket.  Officer Elie asked Defendant to allow the officer to retrieve the item for officer safety.  Officer Elie then seized a small black bag from Defendant's pocket that contained items related to illegal drug use: alcohol swabs, syringes, and a spoon.  Officer Elie then detained Defendant and continued the search of his person.  Officer Elie found and retrieved from Defendant's person two ziploc bags that contained methamphetamine, an electronic scale, and a knife.  Tr. 115-6, 129-36.

The officers also located a pistol underneath the driver's seat of the vehicle.  The woman in the vehicle was not the fugitive, Stephanie Huesca.  After he was taken into custody, Laskowitz began cooperating and gave a statement to the police.  (Doc. 79-1.)

**B.   <u>Search of the residence at 168 Rocky Ford Road</u>.**

On May 14, 2009, APD Officer F. J. Ruben ("Officer Ruben") obtained a search warrant from a DeKalb County Magistrate Judge for 168 Rocky Ford Road, Atlanta, Georgia 30317.  The warrant was based in part upon the stop and the post-arrest statement given by Laskowitz.  (Doc. 79-1.)

6

The warrant was executed on May 15, 2009.  At the residence, officers located and seized four plastic baggies of suspected methamphetamine, two digital scales, two glass smoking pipes, eighty rounds of ammunition, and mail addressed to Defendant Henry postmarked as recently as May 6, 2009.  In the kitchen, they found and seized a Toshiba laptop computer, an external hard drive,[1] and a Motorola cell phone.  Def. Ex. 3.

On June 2, 2009, a federal agent applied for and obtained search warrants from a United States Magistrate Judge to search the contents of the laptop computer and cell phone.  (Docs. 33-1, 34-1.)

Additional facts are discussed in context below.

## III.   **DISCUSSION**

### A.   **The stop of the Nissan was lawful.**

Law enforcement officers may briefly detain an individual for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. Terry v. Ohio, 392 U.S. 1 (1968).  The Terry rationale also applies to brief investigatory stops of vehicles when "'justified by specific, articulable facts sufficient to give rise to

---

[1]  The Government is not using any information found on the external hard drive.

a reasonable suspicion of criminal conduct.'" United States v. Beale, 921 F.2d 1412, 1431 (11th Cir. 1991) (quoting United States v. Smith, 799 F.2d 704, 707 (11th Cir. 1986)).  Such brief investigatory stops do not require probable cause.  United States v. Sokolow, 490 U.S. 1, 7 (1989).  Furthermore, "reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop," not just of the officers who physically stop a car.  United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998) (citing United States v. Williams, 876 F.2d 1521 (11th Cir. 1989).  On the other hand, "more than an inchoate 'hunch'" is required; police must "articulate some minimal, objective justification for an investigatory stop."  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).  The articulated facts must, "when taken together with rational inferences from those facts, reasonably warrant that intrusion."  United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 392 U.S. at 21); accord United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995).  The totality of the circumstances must be considered.  Sokolow, 490 U.S. at 7.

Here, the officers collectively had reason to believe that illegal drug activity was occurring at 168 Rocky Ford Road.  Not only had neighbors recently complained about drug activity at that house, but individuals leaving the house on an earlier occasion had told the police that there was drug activity inside the house.  Also, Ms. Huesca's mother

AO 72A
(Rev.8/8
2)

told the police that her daughter was associated with drug activity at that house, and police saw a young woman[2] leaving the house in the white Nissan.   Adding to the totality of incriminating circumstances were: (1) the trained officer's belief that the driver of the vehicle bent down as if to hide something as soon as he saw the police; and (2) the officer's knowledge, prior to the stop, that the Nissan had an expired tag.[3]

### B.   __The search of Defendant's person after the stop was lawful__.

Defendant argues that even if the stop of the Nissan was lawful, the search of his person was unlawful because his alleged consent to the search was the product of acquiescence to a show of authority.  Defendant's argument is to no avail because the officers did not need Defendant's consent to search his person under the circumstances presented here.

First, as part of the traffic stop, an officer is permitted to order the passenger out of the car.  Maryland v. Wilson, 519 U.S. 408, 410 (1997).  The officer is also permitted to question the passenger, even if the questioning is unrelated to the reason for the traffic stop, as long as the questioning does not prolong the stop.  Arizona v. Johnson,

---

[2]  Inv. Apoian referred to the fugitive and the female who got into the car as a "girl."  Tr. 48, 51.

[3]  Defendant argues that Officer Moore's testimony that he ran the tag prior to the stop was not credible.  I have considered Defendant's arguments, but I have decided to credit Officer Moore's testimony on this point.

9

129 S. Ct. 781, 788 (2009).  During a <u>Terry</u> stop, an officer is entitled to pat down a passenger for weapons or contraband if the officer has a reasonable suspicion that the passenger is armed and dangerous.  <u>Id.</u> at 784.

Once Defendant told the officer that he had something illegal and began to reach for it in his back pocket, the officer had reasonable suspicion that Defendant was armed and dangerous.  Once Defendant admitted that he had contraband, the officer was obviously not required to allow it to remain in Defendant's pocket.  The officer was entitled to seize the bag from Defendant's back pocket and open it to ensure his safety.  Moreover, Defendant's admission that he possessed something illegal gave the officers probable cause to arrest him and to search any closed bags on his person.  <u>See</u> <u>New York v. Belton</u>, 453 U. S. 454 (1981).[4]  In addition, police are permitted to seize even nonthreatening contraband when its incriminating character is immediately apparent to them.  <u>See</u> <u>Minnesota v. Dickerson</u>, 508 U.S. 366 (1993) (recognizing that police may seize nonthreatening contraband detected through sense of touch during protective patdown search for weapons.)

─────────────────

[4]  Once the officer discovered the drug paraphernalia in the bag, there was even greater evidence of criminal activity, justifying a continuation of the search of Defendant's person.

AO 72A
(Rev.8/8
2)

**C.**   **Defendant has standing to challenge the search of 168 Rocky Ford Road.**

The Government contests Defendant's standing to challenge the entry and search of 168 Rocky Ford Road.  In order to challenge a search or seizure on constitutional grounds, the challenging party bears the burden of proving that, at the time of the search, he had a legitimate expectation of privacy in the areas searched.  <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 104 (1980); <u>Rakas v. Illinois</u>, 439 U.S. 128, 139-40 (1978); <u>United States v. Cooper</u>, 133 F.3d 1394, 1398 (11th Cir. 1998).  This showing has two parts: (1) the individual manifested a subjective expectation of privacy in the property searched; and (2) the individual's subjective expectation of privacy is one that society is prepared to recognize as legitimate.  <u>United States v. McBean</u>, 861 F.2d 1570, 1573 n. 7 (11th Cir. 1988).

At the hearing, Defendant contended, through his attorney, that he sometimes slept at the 168 Rocky Ford Road house, but occasionally slept at his girlfriend's house as well.  He also contended that he kept personal possessions at the 168 Rocky Ford Road location and at his girlfriend's house.  Defendant provided evidence in the form of sworn statements by Laskowitz, the named lessee of the house, and Whitney Ray, another occupant of the house, to law enforcement that Defendant lived at 168 Rocky

11

Ford Road and that he occupied a room in that house.  He also established that agents discovered mail recently addressed to him in a room at the house.

The Government correctly contends that Defendant cannot show standing simply through the contentions of Government agents or the theory of the Government's case. See United States v. Zermeno, 66 F.3d 1058. 1062 (9th Cir. 1995).  However, hearsay is admissible at suppression hearings, and I am aware of no case law or rationale that would preclude Defendant's use as evidence of statements that were procured by Government agents. Cf. United States v. Free, No. CR606-001, 2006 WL 2366430, *3 (S.D. Ga. Aug. 14, 2006) (unpublished) (finding expectation of privacy shown in part by statements given to law enforcement officer).

A person may have an expectation of privacy in a home even though it is not his exclusive residence.  In Minnesota v. Olson, 495 U.S. 91, 98 (1990), the Supreme Court held that an overnight guest in someone else's home had a legitimate expectation of privacy, and could therefore challenge a warrantless entry into the host's home to execute an arrest warrant.  Here, Defendant established that he had even more of an expectation of privacy in the 168 Rocky Ford Road residence than an occasional overnight guest.  Two other residents of the house told agents that Defendant lived there, and Defendant's belongings and recent mail addressed to him were found in a

12

room in the house. Cf. United States v. Sangineto-Miranda, 859 F.2d 1501, 1510 (6th

Cir. 1988) (finding that individual who had key to apartment, was afforded unrestricted

access, kept clothes in the apartment and stayed there at least eight times in a one-month

period had an expectation of privacy). Therefore, Defendant has met his burden of

proof on standing. However, Defendant's motions fail for other reasons.

> **D.**    **The search warrant for 168 Rocky Ford Road was supported by probable cause.**

The application for the search warrant for 168 Rocky Ford Road included the

following information: (1) On March 18, 2009, officers responded to a report of an

assault at 168 Rocky Ford Road. One of the participants in the assault told the police

that the assault stemmed from a fight about the alleged theft of methamphetamine;

(2) Utilities at the location were in the name of Stephanie Huesca. Huesca's mother

reported to the police on April 28, 2009, that Huesca was consorting with individuals

involved in the sale of methamphetamine; (3) On May 7, 2009, a vehicle leaving the

location was stopped and methamphetamine packaged for distribution and a digital

scale was recovered from a passenger in the vehicle; (4) A loaded gun was found

underneath the driver's seat of the stopped vehicle; (5) The driver, Laskowitz, was

debriefed, and told the police that Defendant and John Allen ("Allen") routinely use the

residence to prepare methamphetamine for resale and exchange methamphetamine between themselves; (6) Allen was the lessee of 168 Rocky Ford Road.  (Doc. 79-1.)

The task of a judicial officer from whom a search warrant is requested is simply to make a practical, common sense decision of whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Illinois v. Gates, 462 U.S. 213 (1983).  Probable cause deals with probabilities, not technicalities.  Thus, the judicial officer must consider the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949).  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and common sense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.  Gates, 462 U.S. 213; United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994).

Applying these standards to the instant case, it is clear that there was probable cause to believe that drug activity was occurring at 168 Rocky Ford Road.  Defendant contends, however,  that the information in the affidavit about drug dealing at the house

14

was stale, i.e., not close enough in time to support a finding of current drug activity at the residence.

The affidavit supporting a search warrant must allege criminal activity occurring close enough to the time the warrant is issued to justify a finding of probable cause at that time. Sgro v. United States, 287 U.S. 206, 210 (1932). Probable cause can become stale if there is a significant lapse of time between the observed drug activity and the issuance of the search warrant.

The information in the application was sufficiently current. The warrant was signed on May 14, 2009. The information provided by Stephanie Huesca's mother was provided on April 28, 2009, and Laskowitz's statements regarding drug activity at the residence were provided on May 7, 2009.

There is no particular time after which information becomes stale. Staleness is an issue that must be decided on a case-by-case basis. See United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000). Because "[p]rotracted and continuous activity is inherent in large-scale drug trafficking operations," the timing of specific events observed by law enforcement officers become less important in evaluating staleness in such operations. See United States v. Bascaro, 742 F.2d 1335, 1346 (11th Cir. 1984).

15

Under the circumstances of this case, the information provided in the warrant application was not stale.

**E.    Good Faith**.

In any event, this case is governed by United States v. Leon, 468 U.S. 897(1984). In Leon, the Supreme Court recognized a good faith exception to the exclusionary rule for searches that are conducted pursuant to warrants.  The Court held that suppression of evidence would have no deterrent effect where an officer, acting with objective good faith, has obtained a search warrant from a judge or magistrate and has acted within its scope.  See id. at 920-25.  Even if lacking in probable cause, the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

**F.    The warrant did not contain a material misrepresentation or omission.**

Defendant contends that the affidavit in support of the search warrant contained a material misrepresentation, namely that Laskowitz stated that he and Allen *routinely* utilized 168 Rocky Ford Road to prepare methamphetamine for resale and exchange methamphetamine between themselves.  It is true that Laskowitz did not use the word "routinely" in his statement to the police.  The relevant portion of Laskowitz's statement to the police was as follows:

16

Q: Have you ever personally witnessed Justin [Henry] engage in a narcotics transaction?
A: *Yes many times.*
Q: Where did those transactions take place?
A: Different places. The Marathon gas station on [H]ill [S]treet.  The BP in Little Five Points.  *His house on Rocky Ford Rd.*  Back in his old house.
Q: Have you ever provided assistance to Justin in the sale of narcotics?
A: Yes. I have dropped off Meth to other people at the BP gas station in Little Five Points and the Marathon gas station on Hill Street.
Q Did you personally obtain those drugs from Justin?
A: Yes.
Q: Where would that take place?
A: *Sometimes at his house on Rocky Ford*, sometimes at other people's houses.

(Doc. 79-2) (emphasis added).

While Laskowitz did not use the word "routinely," the affiant reasonably interpreted  Laskowitz's statement to mean that Defendant regularly used the Rocky Ford Road house to get methamphetamine ready for distribution to customers.  The affiant  was not required to use the exact terminology used by Laskowitz in order for his affidavit to be accurate.  I find that the officer did not make a misrepresentation in his paraphrasing of Laskowitz's statement.

Defendant also contends that the affidavit omitted the material fact that Allen had moved out of the 168 Rocky Ford house about two weeks before May 7, 2009, and was staying in hotels.  This argument also fails.  The fact that Allen had moved out and was living in hotels does not substantially detract from the other evidence that the Rocky

17

Ford Road house was used for drug transactions.  In other words, the affidavit would have still provided probable cause to search, even if this fact had been included.

### G.   Defendant does not have standing to challenge the search or seizure of the laptop computer or cell phone.

Defendant also contends that the officers exceeded the scope of the warrant when they seized a laptop computer and a cell phone at 168 Rocky Ford Road.  The computer and cell phone were found in the kitchen of the four bedroom  house in which several people lived.  Def. Ex. 3; Tr. 13.  At the evidentiary hearing, Defendant's attorney told the Court that Defendant had previously possessed and used the computer.  However, Defendant also maintained that prior to the time that the officers seized the computer, he had given it to his niece, who also lived at the house.  Defendant also took the position that the cell phone was not his.  Tr. 11-13.

Fourth Amendment rights are personal, "and cannot be asserted vicariously." Rakas, 439 U.S. at 133.  Because Defendant denies that the cell phone and the computer were his, and these items were found in the kitchen of a home used by several people, Defendant cannot show that he had a reasonable expectation of privacy in them.  He therefore lacks standing to challenge the seizure of the computer or cell phone.[5]

---

[5]  Courts have held that defendants cannot rely on the Government's position or theory to establish standing and must instead prove their expectation of privacy as to a particular search.  United States v. Singleton, 987 F.2d 1444 (9th Cir. 1993) (holding

### H.     Defendant Voluntarily Made Statements

On December 29, 2009, Joel Sheppard ("Agent Sheppard"), an agent with the United States Bureau of Alcohol, Tobacco, and Firearms ("ATF"), assigned to the United States Marshal Fugitive Task Force, interviewed and took custody of Defendant. At the time of the interview, Defendant was in the custody of A&B Bonding Company. A representative of that bonding company had picked up Defendant on a state case, but then called ATF because there was an active warrant for Defendant on this federal case. Tr. 174.

As soon as Agent Sheppard arrived at A&B Bonding Company, he showed Defendant his credentials and read him his <u>Miranda</u> rights. Tr. 178; Gov. Ex. 1. Defendant does not contend that Agent Sheppard's advice of rights was incomplete. Agent Sheppard asked Defendant if he understood his rights, and Defendant said that he did. Tr. 181. Agent Sheppard then handed Defendant the written form containing the Statement of Rights and Waiver. Defendant signed the form in two places indicating that he understood his rights, voluntarily waived his rights, and was willing

_____

that the district court erred in relying solely on the government's theory of the case in finding that the defendant had standing to contest the search); <u>United States v. Apple</u>, 915 F.2d 899, 907 (4th Cir. 1990); <u>United States v. Holland</u>, 985 F. Supp. 587, 601 (D. Md. 1997). <u>See also United States v. Thompson</u>, 171 F. App'x 823, 828 (11th Cir. 2006) (unpublished).

19

AO 72A
(Rev.8/8
2)

to make a statement and answer questions.  Gov. Ex. 1.  Sheppard then conducted an interview of Defendant.  Gov. Ex. 2.

At the evidentiary hearing, Defendant's attorney asked the Court to keep the record open so that he could present testimony from Robbie Brewer ("Brewer"), one member of the team from A&B Bonding Company that had located and arrested Defendant.  Tr. 40, 188.  Defendant's attorney proffered that Mr. Brewer would know about Defendant's condition at the time of his arrest and during the advice and waiver of rights at the bonding company.  Tr. 210.  Defendant's attorney had made no effort to secure Mr. Brewer's presence at the evidentiary hearing either by subpoena or writ.[6] I advised Defendant's attorney that the record was closed, but he could file a motion to reopen the record with a proffer of what Mr. Brewer would say.

Defendant later filed a motion to reopen the record to give him an opportunity to present evidence from Mr. Brewer.  (Doc. 66.)  His motion did not include an affidavit from Mr. Brewer, but he wrote that Mr. Brewer would testify:

> that he was part of the team from A&B Bonding that located and arrested
> Mr. Henry at Auburn Avenue and Jackson Street in Atlanta, Georgia.
> Mr. Brewer will testify that 2-3 empty syringes were located on Mr. Henry
> during a search of his person and destroyed.  Mr. Brewer will testify that,

---

[6] Defendant's counsel stated that Mr. Brewer had been arrested on March 22, 2010, over two weeks prior to the evidentiary hearing.  He did not indicate, however, when or if Mr. Brewer had been released from jail.

20

> on December 29, 2009, at the time he was arrested, Mr. Henry appeared
> to be under the influence of drugs, was rambling, had slurred speech, and
> appeared disheveled and fatigued, as if he had been awake for days.
> Mr. Brewer will testify that Mr. Henry was overwrought and not in his
> right mind, and talking of killing himself. It is anticipated that Mr. Brewer
> would testify that Mr. Henry was a methamphetamine user.  Mr. Brewer
> will testify that Mr. Henry was in this same condition at A&B Bonding
> during the time he executed the waiver of his Miranda rights.

(Doc. 66 at 3.)  Defendant also, for the first time, requested an opportunity to present

evidence from an expert to explain the effect of the use of methamphetamine on a

person's mental faculties and behavior, including the medical effects of the drug on a

person's ability to understand and appreciate the consequences of one's actions and to

make decisions based upon free will and not a result of being overborne by the effects

of the drug.  (Doc. 66 at 5.)

I exercised my discretion not to reopen the record for several reasons.  First,

Defendant has not shown that he attempted to have his witnesses at the suppression

hearing.  Second, Defendant has not presented any affidavit in support of his motion

that establishes what the proposed witnesses would say.  Finally, most importantly, the

proffered testimony would not result in the suppression of evidence.

There is a two-part inquiry into whether or not a defendant's waiver of <u>Miranda</u>

rights was voluntary, knowing, and intelligent. <u>United States v. Barbour</u>, 70 F.3d 580,

585 (11th Cir. 1995) (citing <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).   The

Eleventh Circuit states in <u>Barbour</u>:

> First, the relinquishment of the right must have been voluntary in the sense
> that it was the product of a free and deliberate choice rather than
> intimidation, coercion, or deception. Second, the waiver must have been
> made with a full awareness of both the nature of the right being abandoned
> and the consequences of the decision to abandon it. Only if the totality of
> the circumstances surrounding the interrogation reveal both an uncoerced
> choice and the requisite level of comprehension may a court properly
> conclude that the *Miranda* rights have been waived.

<u>Barbour</u>, 70 F.3d at 585 (quoting <u>Moran</u>, 475 U.S. at 421).

As to the first prong of the inquiry, "The fact that a defendant suffers from a

mental disability does not, by itself, render a waiver involuntary; there must be coercion

by an official actor." <u>Id.</u> (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-170 (1986)).

Here, there was no coercion by any law enforcement officer.

As to the second prong, Defendant argues that given his condition, he could show

that he was not fully aware of the nature of the rights being abandoned and the

consequences of the decision to abandon them.  However, Agent Sheppard testified that

Defendant's speech was normal, he was not slurring his words, and he did not seem to

be under the influence of drugs or intoxicated.  Defendant never told Agent Sheppard

that he felt ill or could not understand what was going on.  Tr. 181.  Defendant's

responses to the interview questions were responsive, detailed and coherent.  Gov. Ex. 2.

In light of Agent Sheppard's testimony and my review of Defendant's statement, the proffered testimony from Robbie Brewer would not have changed my conclusion that Defendant was fully aware of the nature of the rights being abandoned and the consequences of his decision to abandon them.  Moreover, there is no reason to believe that expert testimony would support Defendant's position.

**I.    The later-obtained search warrants for the cell phone and the computer were lawfully obtained and executed.**

Search warrants for a cell phone and computer were obtained on June 2, 2009, after APD seized the items during the May 14-15 search of 168 Rocky Ford Road.  (See Docs. 33, Att. 1 (cell phone) and 34, Att. 1 (laptop); Docs. 55 (laptop) and 56 (cell phone)).  As discussed above, Defendant does not have standing to challenge the searches of the cell phone and computer.  In any event, contrary to Defendant's arguments, the search warrants obtained by ATF were based upon probable cause.

The affidavits for the search warrant set forth the background information (1) regarding the stop of the white Nissan, including the recovery of drugs and drug paraphernalia from Defendant's person; (2) the recovery of the gun from underneath the driver's seat; and (3) the statements of Laskowitz (who is referred to in the affidavit as

23

"CF" for convicted felon) about drug activity at Rocky Ford Road.  The affidavit also included Laskowitz's statement that Defendant had in his possession at 168 Rocky Ford Road a black laptop computer, which contained a photographic image of Defendant holding the gun that was found in the car.  The affidavit then described the search of the 168 Rocky Ford Road house and the recovery of drugs, drug paraphernalia, ammunition, a laptop computer, and a cell phone.

Under the applicable standards, the affidavit provided probable cause for the search of the computer and cell phone.

## IV.   **CONCLUSION**

In sum, I **RECOMMEND** that Defendant's Motion to Suppress Statements [Doc. 30] be **DENIED**; Motion to Suppress evidence from traffic stop [Doc. 31] be **DENIED**; Motion to Suppress evidence from search of the Rocky Ford Road house [Docs. 32 and 54] be **DENIED**; Motion to Suppress search of cell phone [Doc. 33 and 56] be **DENIED**; and Motion to Suppress search of laptop [Doc. 34 and 55] be **DENIED**.

I **HEREBY GRANT** Defendant's Motion to Adopt Co-Defendant Allen's Motion for Bill of Particulars[7] [Doc. 57], **DENY** his Motion to Open Record and Stay

---

[7]The Clerk is **DIRECTED** to docket co-defendant Allen's Motion for Bill of Particulars [Doc. 46] in a separate entry as to Defendant Henry.  I hereby **GRANT** Defendant Henry's Motion for Bill of Particulars.

24

Briefing Schedule [Doc. 66], and **GRANT** his Motion for Leave to File Excess Pages [Doc. 68].

I will certify this case ready for trial in a separate order.

**IT IS SO ORDERED** and **RECOMMENDED**, this  7th   day of December, 2010.

*Gerrilyn G. Brill*

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

25